## TIFFANY PRODUCTIONS, Inc., v. DEWING et al., and three other cases.

Nos. 1626–1629.

District Court, D. Maryland.

May 14, 1931.

912

Cook, Chesnut & Markell, of Baltimore, Md. (Gabriel L. Hess and Edward A. Sargoy, both of New York City, and S. Ralph Warnken and Edward A. Smith, both of Baltimore, Md., of counsel), for plaintiffs.

Harry Wroth Shenton, of Baltimore, Md., and Samuel M. Boyd, of Washington, D. C. (Samuel M. Boyd, of Washington, D. C., of counsel), for defendants.

WILLIAM C. COLEMAN, District Judge.

The questions here involved arise under the Copyright Law (17 USCA § 1 et seq.) in its relation to motion pictures, infringement of which the plaintiffs allege in each of the four cases which have been consolidated and heard as one. The material facts are as follows: Plaintiffs are proprietors and distributors of various copyrighted motion pictures. Defendants own and operate a theater in the town of Greeensboro and also one in the town of Centreville, Md. At the theater in Greens-boro, a number of the plaintiffs' copyrighted motion pictures were exhibited without a license, the films having come into the defendants' hands pursuant to a contract made with one of the defendants which permitted only limited exhibitions of the films at the theater in Centreville; vice versa, a picture of one of the plaintiffs (RKO Productions, Inc.), delivered to the theater in Greensboro under a license contract for a single day's exhibition at that theater alone, was exhibited by the defendants at the theater in Centreville. This practice of exhibiting motion pictures at times or places prohibited by the license agreements is commonly known in the industry as holding over or bicycling. The films are not produced for sale by the plaintiffs, but are distributed pursuant to so-called standard exhibition contracts (the form of which was adopted at a general trade conference in 1927); through numerous exchange centers, located throughout the United States. The right of the exhibitor signing such contract to exhibit the film is strictly limited as to time and place. It further appears that a picture of one of the plaintiffs, namely, Warner Bros. Pictures, Inc., was exhibited at the Greensboro theater after the defendants had been served with a complaint by the plaintiffs on account of an alleged similar infringement by exhibition of another of its pictures. In all four suits the relief sought is an injunction and damages under the Copyright Law.

Prior to answering the bills of complaint the defendants moved to dismiss them on the ground of lack of jurisdiction. After hearing, these motions were denied, answers were filed, and testimony taken, as a result of which three questions have been presented to the court for decision. First, does the Copyright Law give a right of action because of unlicensed exhibition of copyrighted motion pictures? Second, does plaintiffs' refusal to arbitrate their claims against the defendants, in accordance with the arbitration provisions in the licensed contracts, preclude plaintiffs from the right to resort to the present action? Third, assuming that plaintiffs are entitled to damages, must the court, as they contend, grant them an election to take the minimum statutory damages of $250 for each infringement in lieu of actual damages, or, as defendants contend, may the court award nominal damages for each infringement as the actual damages sustained?

While similar suits appear to have been brought in several other federal courts, they were for the most part uncontested, and no-

reported opinions dealing with these precise points existed when the cases were heard. The questions will be considered in the order above stated. We therefore come to the first question, namely, Does the Copyright Law give a right of action because of unlicensed exhibition of copyrighted motion pictures?

The provisions of the Copyright Law pertinent to this inquiry are the following:

"Any person entitled thereto, upon complying with the provisions of this title, shall have the exclusive right:

"(a) To print, reprint, publish, copy, and vend the copyrighted work. * * *

"(d) To perform or represent the copyrighted work publicly if it be a drama or, if it be a dramatic work and not reproduced in copies for sale, to vend any manuscript or any record whatsoever thereof; to make or to procure the making of any transcription or record thereof by or from which, in whole or in part, it may in any manner or by any method be exhibited, performed, represented, produced, or reproduced; and to exhibit, perform, represent, produce, or reproduce it in any manner or by any method whatsoever. * * * *" 17 USCA § 1.

"Application for registration shall specify to which of the following classes the work in which copyright is claimed belongs: * * *

"(d) Dramatic or dramatico-musical compositions; * * *

"(l) Motion-picture photoplays;

"(m) Motion pictures other than photoplays.

"The above specifications shall not be held to limit the subject matter of copyright as defined in section 4 of this title, nor shall any error in classification invalidate or impair the copyright protection secured under this title." (17 USCA § 5).

"Copyright may also be had of the works of an author, of which copies are not reproduced for sale, by the deposit, with claim of copyright, of one complete copy of such work if it be a lecture or similar production or a dramatic, musical, or dramatico-musical composition; of a title and description, with one print taken from each scene or act, if the work be a motion-picture photoplay; * * * of a title and description, with not less than two prints taken from different sections of a complete motion picture, if the work be a motion picture other than a photoplay. * * * *" (17 USCA § 11).

The classifications (l) and (m) above quoted of section 5, and the quoted provision of section 11 prescribing the method for registering copies of motion pictures, were brought into the Act of March 4, 1909, by amendment in 1912 (35 Stat. 1075–1088; 37 Stat. 488). Defendants contend that these amendments of 1912 indicate that motion pictures then came for the first time under the protection of the copyright laws; that the protection thereupon granted was limited, namely, that it was merely against duplication or vending of films, and that an unlicensed exhibition of a copyrighted picture is not within the scope of the protection afforded. In short, defendants contend that the exhibitions here complained of are neither a "publication" nor a "copy" within the meaning of section 1 (a) of the act, and further contend that a motion picture cannot be classed as a "dramatic work" as that phrase is used in section 1 (d).

The question whether the exhibition or display of a moving picture is a "copy" within the meaning of section 1 (a) of the act is probably disposed of by the Supreme Court in the case of White-Smith Music Publishing Co. v. Apollo Co., 209 U. S. 1, 28 S. Ct. 319, 52 L. Ed. 655, 14 Ann. Cas. 628. The language of this opinion, rendered prior to the amendment of 1909, would seem to require a negative answer to the question. There the court decided that a copy of a musical composition within the meaning of the statute does not include perforated rolls, that is, pianola records, saying, page 17 of 209 U. S., 28 S. Ct. 319, 323, that the definition of the word "copy" "which most commends itself to our judgment is perhaps as clear as can be made, and defines a copy of a musical composition to be 'a written or printed record of it in intelligible notation.' * * * The statute has not provided for the protection of the intellectual conception apart from the thing produced, however meritorious such conception may be, but has provided for the making and filing of a tangible thing, against the publication and duplication of which it is the purpose of the statute to protect the composer." In this case there was no complaint of the public performance of copyrighted music, nor was there involved the question whether the manufacturers of the perforated music rolls, when sold for use in public performance, might be held as contributing infringers. One of the purposes of the amendment of 1909 was to overcome the effect of this decision, and to afford the copyright owner adequate protection of his mechanical rights. See Irving Berlin, Inc., v. Daigle (C.

C. A.) 31 F.(2d) 832. 17 USCA §§ 1 (e), 5, 25 (e).

Turning next to the question whether the exhibition of a moving picture is a "publication" within the meaning of section 1 (a) of the act, the decision of the Supreme Court in the last-mentioned case is also strongly persuasive of a negative answer to this question, although the generally recognized definition of the word "publication" would seem to warrant a contrary conclusion. In its ordinary acceptation the word "publication" means "to make public; to make known to people in general * * * to bring before the public, as for sale or distribution; especially (a) to print, or cause to be printed, and to issue from the press either for sale or general distribution, as a book, newspaper, piece of music, engraving, etc." Webster's International Dictionary. "To make public, to make known to people in general; * * * to exhibit, display, disclose or reveal." Century Dictionary. Sale is, of course, not an essential element. If, where the question is whether an author has lost his common-law or statutory copyright, publication is accomplished by placing a book in a library (Jewelers' Mercantile Agency v. Jewelers' Publishing Co., 155 N. Y. 241, 49 N. E. 872, 41 L. R. A. 846, 63 Am. St. Rep. 666), or delivering it to a public office, or place (Callaghan v. Myers, 128 U. S. 617, 9 S. Ct. 177, 32 L. Ed. 547; D'Ole v. Kansas City Star Co. [C. C.] 94 F. 840), it is difficult to see any valid distinction, when, as a practical matter, the value of the copyright consists in the monopolistic right to project and exhibit the picture itself from each and every film, as well as in the right to exclude others from duplicating the film. Protection merely of the latter right may be entirely ineffectual to accomplish the desired end. The statute must be given a sensible meaning in its application to modern invention, expressly within the scope of the statute. See Buck et al. v. Jewell-LaSalle Realty Co., 51 S. Ct. 410, 75 L. Ed. —— decided by the Supreme Court, April 13, 1931.

In Universal Film Manufacturing Co. v. Copperman (C. C. A.) 218 F. 577, the court clearly intimated that the exhibition of a copyrighted motion picture would have been considered an infringement of the copyright, except for the fact that the copyright was found to be void because of prior publication and dedication in England before registration in the United States. Similarly, in MacMillan v. King (D. C.) 223 F. 862, it was held that, where a teacher lent to his students mimeographed typewritten copies of parts of a copyrighted text-book, such was both a printing and publication within the meaning of the Copyright Act.

However, assuming, without deciding, that the exhibition here complained of was neither a "publication" nor a "copy" within the meaning of section 1 (a) of the act, there would seem to be no escape from the conclusion that the plaintiffs are nevertheless entitled to invoke the protection of section 1 (d) on the ground that a "motion-picture photo-play" is a "dramatic work." They are both cognate forms of production. It is no longer open to question that a moving picture presentation of an author's copyright-work is a dramatization of such work (although dramatic and motion picture rights may be made the subject of independent contract), and that the person producing the films for such pictures and offering them for sale or exhibition, without a license so to do, even if not himself exhibiting them, is liable for infringement. This was decided in Kalem Co. v. Harper Bros., 222 U. S. 55, 32 S. Ct. 20, 56 L. Ed. 92, Ann. Cas. 1913A, 1285. There Justice Holmes, rendering the opinion of the court upholding a decree restraining an alleged infringement of the copyright upon General Lew Wallace's "Ben Hur," said, pages 61, 62 of 222 U. S., 32 S. Ct. 20, 21: "We are of opinion that Ben Hur was dramatized by what was done. Whether we consider the purpose of this clause of the statute, or the etymological history and present usages of language, drama may be achieved by action as well as by speech. Action can tell a story, display all the most vivid relations between men, and depict every kind of human emotion, without the aid of a word. It would be impossible to deny the title of drama to pantomime as played by masters of the art. Daly v. Palmer, 6 Blatchf. 256, 264, Fed. Cas. No. 3,552. But if a pantomime of Ben Hur would be a dramatizing of Ben Hur, it would be none the less so that it was exhibited to the audience by reflection from a glass, and not by direct vision of the figures,—as sometimes has been done in order to produce ghostly or inexplicable effects. The essence of the matter in the case last supposed is not the mechanism employed, but that we see the event or story lived. The moving pictures are only less vivid than reflections from a mirror. With the former as with the latter our visual impression—what we see—is caused by the real pantomime of real men through the medium of natural forces, although the machinery is different and more

complex." See, also, Photo-Drama Motion Picture Co., Inc., v. Social Uplift Film Corp. (C. C. A.) 220 F. 448; Klein v. Beach (C. C. A.) 239 F. 108; U. S. v. Motion Picture Patents Co. (D. C.) 225 F. 800; Id. (D. C.) 230 F. 541; Id., 247 U. S. 524, 38 S. Ct. 578, 62 L. Ed. 1248; Atlas Mfg. Co. v. Street & Smith (C. C. A.) 204 F. 398, 47 L. R. A. (N. S.) 1002; Id., 231 U. S. 349, 34 S. Ct. 73, 58 L. Ed. 262; Id., 231 U. S. 755, 34 S. Ct. 323, 58 L. Ed. 468; Id., 232 U. S. 725, 34 S. Ct. 602, 58 L. Ed. 815.

To the contention that, since section 5 has separate classifications for dramatic or dramatico-musical compositions and for motion picture photoplays, therefore section 1 (d) is not to be interpreted as embracing the latter, it is sufficient to point out that the classification of section 5 is merely for the convenience of the copyright office and of applicants for copyrights. Such interpretation is strengthened by the last paragraph of section 5.

The case of Littleton v. Oliver Ditson Co. (C. C.) 62 F. 597, is stressed as requiring a contrary conclusion. But that case involved different provisions of the law, and is not to be taken as in conflict with an interpretation of those provisions actually before us which is the most reasonable interpretation in the light of what the Supreme Court and various Circuit Courts of Appeal have since said.

We find nothing in the congressional debates which indicate a different legislative intent. In fact, the question appears not to have been discussed when sections 5, 11, and 25 were amended in 1912. The debates that occurred with respect to prohibiting and penalizing the unauthorized exhibition, through moving pictures, of copyrighted plays and books, are obviously not apposite to the precise point. Since, then, a motion picture photoplay is to be considered as embraced within the term "dramatic work," as used in section 1 (d), and since, if copyrighted, it is an infringement for one without permission "to exhibit, perform, represent, produce, or reproduce it in any manner or by any method whatsoever," projecting it upon the screen is of course within the prohibition. The fact that the construction of the statute here adopted excludes motion pictures other than photoplays may produce an undesirable or even inequable result. But that is a practical, not a legal objection, properly to be addressed to the lawmakers, not to the courts. Only photoplays are here involved.

We now turn to the second question, namely, Does plaintiffs' refusal to arbitrate their claims against the defendants, in accordance with the arbitration provisions in the license contracts, preclude plaintiffs from the right to resort to the present action?

Since the present case was submitted, two decisions have been rendered which set at rest any further controversy on this point, and require that the question be answered in the negative. One of these decisions is by the Supreme Court, Paramount Famous Lasky Corporation v. U. S., 282 U. S. 30, 51 S. Ct. 42, 75 L. Ed. 145, and the other, Paramount Famous Lasky Corporation v. National Theatre Corporation, 49 F.(2d) 64, 65, is by the Circuit Court of Appeals for this circuit. In both of these cases the standard form of contract now before us was under consideration. In the first decision, the arbitration provisions of that contract were declared to be in violation of the Sherman Anti-Trust Act (15 USCA § 1 et seq.), and therefore void. In the other decision, the precise question now under consideration was before the Circuit Court of Appeals. The court said:

"The judge below sustained the demurrer on the ground that the arbitration provision was a condition precedent to the bringing of any suit on the contract, notwithstanding the injunction, which prevented arbitration, and based his opinion upon a number of authorities holding that, where the condition precedent to the bringing of suit was prevented from being carried out by some unlawful act of the parties seeking to set up the injunction as a reason for not carrying out the condition, the excuse or reason could not be availed of by the parties seeking to bring the action. An examination of the authorities relied upon by the court below shows that the act of the party making it impossible to carry out the condition precedent to suit was either a subsequent act or at least not the act itself of incorporating the unlawful condition in the contract sued upon. * * * These cases are easily to be distinguished from the instant case, where a clause of the very contract itself entered into by both parties has been declared unlawful and enjoined. Certainly, it cannot be said, especially in view of the clause in the decree above quoted, exempting the rest of the contract from the taint of unlawfulness, that the whole contract is void, and that in case of breach by either party no remedy could be had.

"The record also shows that, because of the injunction secured by the United States government, the machinery for arbitration set up in the contract had ceased to exist, and the rule that an act of law, due to the act or default of one of the parties, cannot be relied upon as an excuse for his nonperformance of the contract, has no application to the facts in this case. * * *

"It would, therefore, seem, in view of the cases herein cited, that the proper rule of law is that, where the obligation itself is unlawful and cannot be performed, such performance should be excused, provided the contract is divisible and the remainder of the contract is lawful. It is certainly an anomalous situation in which this plaintiff finds itself under the ruling of the court below. It is enjoined from performing a condition precedent, but no relief is accorded it, because it does not perform the condition.

"Again we think that the learned judge below was in error for another reason, and that is that the contract, as far as it related to the lawful and unlawful parts, was divisible. That this was the opinion of Judge Thacher, in the case of United States v. Paramount Famous Lasky Corporation [(D. C.) 34 F.(2d) 984], supra, is shown by the excerpt from his decree. That such a provision, as the one in question here, is separable from the rest of the contract, is borne out by a number of decisions. * * * "

 The contention that plaintiffs, by intrusting their films to defendants, pursuant to the terms of their contracts, have made an election of remedies, namely, have waived their right to sue in tort under the Copyright Law, and are relegated to a suit in assumpsit on the contract, is unsound. While it is true that the suit in the last-named case was an action in assumpsit, that form of action is merely an alternate remedy, and nothing which the plaintiffs in the present case have done precludes them from their right to resort to the remedy provided under the Copyright Law. Henry v. Dick, 224 U. S. 1, 32 S. Ct. 364, 56 L. Ed. 645, Ann. Cas. 1913D, 880; Healy v. Sea Gull Specialty Co., 237 U. S. 479, 35 S. Ct. 658, 59 L. Ed. 1056. An election of remedies presupposes a choice of one to the exclusion of the other. In order to constitute an election, the party must pursue one of the remedies. That is to say, there must be some decisive action by such party, with knowledge of the facts and of his rights. Robb v. Vos, 155 U. S. 13, 15 S. Ct. 4, 39 L.

Ed. 52; U. S. v. Oregon Lumber Co., 260 U. S. 290, 43 S. Ct. 100, 67 L. Ed. 261.

█ Plaintiffs' right to invoke the Copyright Law, therefore, being clear, and it being equally clear that on the admitted facts in all four cases infringement has occurred, we come to the final question of what damages plaintiffs are entitled to. They contend that they have the right to elect to take the minimum statutory damages of $250 for each infringement in lieu of actual damages, which have not been proved, while defendants contend that the court may award nominal damages for each infringement.

The pertinent provisions of the Copyright Law are the following:

"If any person shall infringe the copyright in any work protected under the copyright laws of the United States such person shall be liable:

"(a) To an injunction restraining such infringement;

"(b) To pay to the copyright proprietor such damages as the copyright proprietor may have suffered due to the infringement, as well as all the profits which the infringer shall have made from such infringement * * * or in lieu of actual damages and profits such damages as to the court shall appear to be just, and in assessing such damages the court may, in its discretion, allow the amounts as hereinafter stated, but [here follow limitations applicable specifically to newspaper reproductions of photographs, and certain motion picture infringements of undramatized or nondramatic work and of copyrighted dramatic or dramatico-musical work], and such damages shall in no other case exceed the sum of $5,000 nor be less than the sum of $250, and shall not be regarded as a penalty. But the foregoing exceptions shall not deprive the copyright proprietor of any other remedy given him under this law, nor shall the limitation as to the amount of recovery apply to infringements occurring after the actual notice to a defendant, either by service of process in a suit or other written notice served upon him. * * *

"Fourth. In the case of a dramatic or dramatico-musical or a choral or orchestral composition, $100 for the first and $50 for every subsequent infringing performance; in the case of other musical compositions $10 for every infringing performance." 17 USCA § 25.

This final question is disposed of in favor

of the plaintiffs by the very recent decision of the Supreme Court in Jewell-LaSalle Realty Co. v. Gene Buck, 51 S. Ct. 407, 408, 75 L. Ed. ——. In that case the American Society of Composers, Authors, and Publishers, and one of its members, sued the Jewell-LaSalle Realty Company in the federal court for Western Missouri, for an unauthorized orchestral performance of a musical composition for which the plaintiffs held exclusive nondramatic performing rights. Just as here, the infringement was proved, but there was no showing of actual damages. The defendant contended that the plaintiffs were entitled to only $10 statutory damages, while plaintiffs claimed that $250 was the allowable minimum. The lower court [32 F.(2d) 366] granted an injunction and awarded $250 damages, from which the defendant appealed, and the Circuit Court of Appeals certified the three following questions:

"In a case disclosing infringement of a copyright covering a musical composition, there being no proof of actual damages, is the court bound by the minimum amount of $250 set out in the so-called 'no other case' clause of section 25 (b) of the Copyright Act (17 USCA § 25), reading, 'and such damages shall in no other case exceed the sum of $5,000 nor be less than the sum of $250, and shall not be regarded as a penalty?' "

"Is section 25 (b) Fourth of the Copyright Act (17 USCA § 25), applicable in the discretion of the Court, to a case disclosing infringement of copyright covering a musical composition, there being no proof of actual damage?"

"In section 25 (b) of the Copyright Act (17 USCA § 25) is the clause reading, 'nor shall the limitation as to the amount of recovery apply to infringements occurring after the actual notice to a defendant,' confined in its scope to the particular cases of infringement theretofore specifically mentioned in said section 25 (b)?"

Answering the first question in the affirmative, the court said: "The Copyright Act confers two monopolies—that of making copies and that of giving public performances for profit. It was settled in Westerman Co. v. Dispatch Printing Co., 249 U. S. 100, 39 S. Ct. 194, 63 L. Ed. 499, which dealt with the infringement by a newspaper of the monopoly of copying, that for each publication $250 is the minimum damages. An unbroken line of decisions in the lower courts has since held that the rule declared in the

Westerman Case is applicable also to infringement of the monopoly of giving public performances. It is now contended that, as applied to performances, the rule is burdensome and unreasonable; that it was followed unwillingly by the lower courts in the mistaken belief that the Westerman Case required them to do so; that the legislative history of section 25, when considered in the light of earlier Copyright Acts, indicates that the fourth subdivision, relating to musical compositions, was not intended to be controlled by the maximum and minimum provisions of the so-called 'no other case' clause; and that the decision in the Westerman Case is not decisive of the question certified." After analysing the opposing arguments, the court continued:

"The history of the section, as revealed in the extended hearings which preceded the act of 1909, makes the contrary clear. We are of opinion that the maximum and minimum provisions were intended to be applicable alike to all types of infringement except those for which the section makes other specific provision.

"It is urged, however, that under such interpretation the suggested measure of $10 a performance, scheduled in the fourth subdivision of section 25, would not be applicable unless more than twenty-five infringing performances were proved. This appears to be the meaning of the section, read as a whole, particularly since the amounts in the scheduled subdivisions appear to have been inserted merely as an aid to the court in awarding such damages as 'shall appear to be just.' The definite specification of a maximum and minimum in every case, is not contradicted in any way by these legislative suggestions as to what may be deemed reasonable allowances in cases falling within the prescribed limitations. See Westerman v. Dispatch Printing Co., 249 U. S. 100, 106, 109, 39 S. Ct. 194, 63 L. Ed. 499. If, as applied to musical compositions, the provisions of the entire section have proved unreasonable, the remedy lies with Congress."

Substituting the words "dramatic compositions" for the words "musical compositions" in the last sentence quoted, the statement of the Supreme Court is an equally complete answer to the defendants' arguments in the present cases.

The Supreme Court also answered in the affirmative the second question above quoted which was certified to it, saying: "This question has in part been necessarily answered by

our discussion of question II, for, unless the number of infringing performances of a copyrighted musical composition exceeds twenty-five, the minimum allowance of $250 must be made. Where more than twenty-five infringing performances are proved, and there is no showing as to actual loss, the court must allow the statutory minimum, and may, in its sound discretion, employ the scheduled $10 a performance as a basis for assessing additional damages. See Westerman v. Dispatch Printing Co., 249 U. S. 100, 106, 39 S. Ct. 194, 63 L. Ed. 499. Subject to this limitation, question III is answered in the affirmative."

In declining to answer the last question (above quoted) certified to it, the court said: "Inasmuch as the plaintiffs did not ask for more than the minimum statutory damages of $250, and did not appeal from the decree awarding only this sum, the question whether the court might have awarded more than the maximum of $5,000 is not properly raised upon the facts presented in this certificate."

Although in one instance the present defendants made an infringing exhibit of a picture after being notified in writing by the plaintiff copyright owner not to do so, no claim is made for more than the statutory damages of $250 for each infringement. Accordingly, the damages will be so decreed in favor of the plaintiffs against the defendants (they being treated as joint tort-feasors in each suit), in addition to an injunction as prayed, and also costs and an attorneys' fee in the aggregate sum for all four suits of $1,000, pursuant to the provisions of section 40 of the Copyright Act (17 USCA § 40).